UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

vs.

Dennis Michael Lemke,

        Defendant.        Crim. No. 08-216 (DWF/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Dismiss the Indictment, Motion to Suppress Evidence Derived from Searches and Seizures, and Motion to Suppress Statements, Admissions, and Answers. A Hearing on the Defendant's Motions was conducted on August 6, 2008, at which time, the Defendant appeared

personally, and by Manvir K. Atwal, Assistant Federal Defender, and the Government appeared by Nathan P. Petterson, Assistant United States Attorney.[1]

For reasons which follow, we recommend that the Defendant's Motion to Dismiss Indictment be denied, that the Defendant's Motion to Suppress Evidence Derived from Searches and Seizures be denied, and that the Defendant's Motion to Suppress Statements, Admissions, and Answers, be denied as moot.

## II.  Factual and Procedural Background

The Defendant is charged with five (5) Counts of Production of Child Pornography, in violation of Title 18 U.S.C. §§2251(a) and 2251(e).  According to the Indictment, the Defendant is alleged to have "knowingly employ[ed], use[d], persuade[d], induce[d], entice[d], and coerce[d]" five (5) minor victims "to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct," on or about May 29, 2004, September 11, 2005, February 18, 2005, February 28, 2006, and April 12, 2006, in this State and District.  See, Indictment,

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendants' Motions.  Leave was granted, and therefore, the last submission on the issues was received on August 18, 2008, at which time, the Motions were taken under advisement.  See, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

<u>Docket No. 9</u>.  The Indictment also charges that the Defendant produced those "visual depictions" with a "Minolta Dimage X digital camera, that had been mailed, shipped, and transported in interstate and foreign commerce."  <u>Id</u>.  As pertinent to those charges, and to the Motions now before us, the operative facts may be briefly summarized.[2]

At the Hearing, no testimony was adduced by either party.  Instead, the Government introduced the following five (5) Exhibits to the Court, without objection from the Defendant:  1) a Search Warrant and supporting Affidavit, dated February 23, 2007, which was issued by a Magistrate Judge in this District ("Exhibit 1" or the "first Search Warrant"), for a search of the Defendant's residence in St. Cloud, Minnesota (the "St. Cloud Home"); 2) a Search Warrant and supporting Affidavit, dated June 17, 2008, which was issued by a Magistrate Judge in this District ("Exhibit

_____

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, <u>United States v. Moore</u>, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 U.S. 1228 (1992); <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 610 (9th Cir. 1990).

2" or the "second Search Warrant"), for the seizure of the Defendant's wedding ring and watch, from the St. Cloud Home; 3) a Search Warrant and supporting Affidavit, dated June 18, 2008, which was issued by the State District Court for Stearns County, Minnesota ("Exhibit 3" or the "third Search Warrant"), for the search of the St. Cloud Home; 4) a Search Warrant and supporting Affidavit, dated June 18, 2008, which was issued by the State District Court for Stearns County, Minnesota ("Exhibit 4" or the "fourth Search Warrant"), for the search of the apartment of the Defendant's parents, in Sartell, Minnesota (the "Sartell Apartment"); and 5) a Search Warrant and supporting Affidavit, dated July 1, 2008, which was issued by the State District Court for Stearns County, Minnesota ("Exhibit 5" or the "fifth Search Warrant"), for the search of the Defendant's Apple iPhone (the "iPhone").

As noted, the first Search Warrant was issued by a Magistrate Judge in this District, on February 23, 2007, see, Exhibit 1, and authorized a search of the St. Cloud Home for internet billing and use records; records or other items that evidence ownership of computer equipment; records that evidence occupancy or ownership of the St. Cloud Home; any records or documents concerning the Ranchi message board; any visual depictions of minors engaged in sexually explicit conduct, in any format or media, including undeveloped photographic film, photographs, magazines,

- 4 -

videotapes, slides, and motion picture films; correspondence, books, ledgers, or other records pertaining to the possession, receipt, distribution, transportation, or advertisement of visual depictions of minors engaged in sexually explicit conduct, transmitted or received using a computer or other means of interstate or foreign commerce; and computers and all related equipment, including software.  <u>Id.</u>, Attachment B.

In support of the Search Warrant, D. Ryan Williams ("Williams"), who is a Special Agent with the Federal Bureau of Investigation ("FBI"), submitted an Application and Affidavit which set forth the reasons that caused him to believe that evidence of criminal activity would be found in the Defendant's St. Cloud Home. <u>Id.</u>, Affidavit.  Williams averred that he is responsible for investigating violations of Federal law, particularly pertaining to the manufacture, possession, and distribution, of child pornography. <u>Id.</u> at ¶1.  In his Affidavit, Williams described how individuals, who are interested in child pornography, can make use of a computer to produce, store, and distribute, images of child pornography. <u>Id.</u> at ¶¶5-9.  He further attests that "[a]s a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography," and "this method of production

does not leave as large a trail for law enforcement to follow as other methods." Id. at ¶9.

Williams further avers that child pornographers are known to store their images on their computers' hard drives, as well as on external storage media, such as floppy disks and external hard drives, which "have the capacity to store hundreds of thousands of images at very high resolution." Id. at ¶¶14-15. William further avers that computerized depictions of child pornography are often stored as GIF files, JPEG files, ZIP files, SIT files, or MPEG files.[3] Id. at ¶17. Once images are transferred among various locations, "[i]t is only with careful laboratory examination of electronic storage devices that it may be possible to recreate the evidence trail." Id. at ¶14.

Williams also detailed how individuals, who are interested in child pornography, can make use of their computers, and online services, to communicate with another, via email, chat rooms, or instant messaging. Id. at ¶¶10-13. Williams attests that "[t]hese communication links allow contacts around the world in a

_____

[3]According to Williams' Affidavit, GIF files and JPEG files are image files, and GIF stands for Graphic Interchange Format, while JPEG stands for Joint Photographic Experts Group. See, Exhibit 1, Affidavit at ¶17. ZIP and SIT files are compressed image files, id., and MPEG stands for Moving Picture Experts Group, and comprise movie or video clips. Id.

relatively secure and anonymous format," and "[t]hese advantages are well known, serving as a foundation of commerce between pornographers." Id. at ¶13. Williams further attests that, "[w]ith proliferation of commercial services and chat services, the computer has become one, if not the preferred method of distribution of pornographic materials." Id. at ¶16.

In his Affidavit, Williams also explained how child pornographers make use of online message boards, in order to view and post text messages, images, videos, or links. Id. at ¶¶18, 21. Williams attests that collectors and distributors of child pornography make use of message boards to share images, by posting messages, and by viewing and replying to each other's messages, which often include hyperlinks to online file hosting services, where message board users can view the pornographic images and videos. Id. at ¶¶19-21. Moreover, Williams attests that, when a computer user visits a particular website, his or her computer can be identified through its Internet Protocol ("IP") address, with the assistance of the user's Internet Service Provider ("ISP"). Id. at ¶20.

In his Affidavit, Williams avers that "[c]hild pornography collectors express their attraction to children through the collection of sexually explicit materials involving children as well as other seemingly innocuous material related to children."

Id. at ¶22.  According to Williams, "[c]hild pornography collectors almost always maintain and possess their material in the privacy and security of their homes or some other secure location such as their vehicle(s) where it is readily available." Id. at ¶26. He related that the collected materials may include "photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images or other visual media." Id. Williams avers that a child pornography collector "rarely, if ever, disposes of the collection" and, "even if a child pornography collector does delete files from his hard drive or other electronic media, a computer expert can still retrieve those files using forensic tools." Id. at ¶27.

Turning to the investigation of the Defendant, Williams recounted that, on July 25, 2006, Wade Luders ("Luders"), who is a Special Agent with the FBI in San Francisco, "became aware of a hard core child pornography message board located in Japan, identified as the 'Ranchi' message board." Id. at ¶28. Williams further avers that users enter the Ranchi message board through "gateway" websites, which are located on web servers in Russia, and which re-direct the users to the Ranchi message board. Id. at ¶29. New users are directed to read the Ranchi message board's Frequently Asked Questions and Tutorials, which describe "how to encrypt and decrypt files, how to remove identifying information from postings, how to utilize

online internet tools to mask IP addresses, and generally how to evade law enforcement." Id. at ¶30. According to Williams, the Tutorials section describes the Ranchi message board as an "underground public board," where users "share all kinds of material specially for all the kiddy lovers around the world," ranging from "non-nude cuties to hardcore baby material." Id.

As recounted by Williams, between July and December of 2006, Luders "downloaded multiple video and image files depicting children engaged in sexual acts with each other and with adults," and Williams described the content of those video and image files in his Affidavit. Id. at ¶31. On October 25, 2006, Luders logged into the Ranchi message board and, as part of an undercover operation, he posted a message which advertised "a video of a real four year-old [sic] female engaging in sexual activity with an adult male," and which directed individuals to visit either of two (2) websites to download the video. Id. at ¶32. However, the links actually "resolved to a file located on Special Agent Luders' covert FBI computer in San Jose, California," and "[t]he file was actually a non-pornographic encrypted image file and did not contain child pornography." Id.

Just over twenty-four (24) hours later, Luders "shut down the webserver on his covert FBI computer and copied the log file," for submission to the FBI evidence

control room.  Id. at ¶33.  According to Williams, analysis of the log file "revealed several hundred unique internet protocol addresses that attempted to download child pornography from Special Agent Luders' covert FBI computer from October 25 to October 26, 2006."  Id. at ¶34.  Thereafter, in November and December of 2006, Luders issued multiple administrative Subpoenas "to identify the individual subscribers to the internet protocol (IP) addresses that accessed the above-mentioned link on the covert FBI computer in San Jose, California."  Id. at ¶35.

Several entries in the log file were traced to a particular IP address, which was controlled by Charter ("Charter") Communications.  Id. at ¶¶36-37.  On November 21, 2006, Charter responded to an administrative Subpoena, and identified the Defendant as the subscriber for that particular IP address, and listed that address as the St. Cloud Home.  Id. at ¶38.  On February 20, 2007, Williams checked a Minnesota Department of Motor Vehicles database, and confirmed that the St. Cloud Home was the Defendant's then-current address.  Id. at ¶39.  Williams also obtained records from the St. Cloud Police Department, which disclosed that, in October of 2006, the Defendant was investigated for alleged sexual misconduct, involving a four-year-old girl, who attended a daycare operated by the Defendant's spouse, at the St. Cloud Home.  Id. at ¶40.

Based upon the foregoing facts, Williams expressed his belief that contraband, evidence, fruits and instrumentalities relating to criminal violations involving child pornography would be found at the St. Cloud Home.  Id. at ¶42.

As noted above, the second Search Warrant was issued by a Magistrate Judge in this District, on June 17, 2008.  See, Exhibit 2. The Search Warrant authorized a search of the St. Cloud Home, and of the Defendant, for "a gold wedding ring with a line of five diamonds, or stones that appear to be diamonds" (the "wedding ring"), and "a men's watch with a black band and a silver face" (the "watch").  Id.  In support of that Search Warrant, Williams submitted an Application and Affidavit which set forth the reasons that caused him to believe that the wedding ring, and the watch, constituted evidence of the commission of a crime, and that they would be found on the Defendant's person, or in the St. Cloud Home.  Id., Affidavit.

As above, Williams recounted that, in October of 2006, the Defendant was alleged to have engaged in sexual misconduct against a four-year-old girl in the St. Cloud Home.  Id. at ¶4.  The victim told her mother that the Defendant "had inappropriately touched her under her clothing when she was attending day care provided by" the Defendant's wife, in the St. Cloud Home.  Id. The St. Cloud Police Department investigated those allegations, but no charges were filed.  Id.

Williams then attested that on February 27, 2007, he participated in the execution of the first Search Warrant at the St. Cloud Home, as described above, during which several items were seized, including a computer, electronic storage media, and a Minolta Dimage X digital camera, which was marked "Made in Japan." Id. at ¶¶5, 10. Williams avers that Minolta has never manufactured cameras in the State of Minnesota. Id. at ¶10.

During a subsequent forensic examination, by Jerry Dewees ("Dewees"), who is a Special Agent with the FBI, Dewees located "an extremely large number of digital images" on the seized computer, "most of which are sexually explicit images of children." Id. at ¶6. In one (1) image, the Defendant is seen "holding and licking a pair of female panties." Id. at ¶7. Williams attests that he identified the Defendant in that image, based upon his familiarity with the Defendant from a personal interview, that was conducted on February 27, 2007, during the search of the St. Cloud Home. Id. Dewees was able to conclude that the image was taken with a Minolta Dimage X digital camera, based upon the exchangeable image file ("EXIF") data, which the camera places on the image. Id.

Dewees also identified approximately three hundred (300) images, which were taken with a Minolta Dimage X digital camera, based upon his review of the EXIF

data for those images.  Id. at ¶8.  Those images included "clear images of [the Defendant], and sexually explicit images of children taken minutes later," based upon Dewees' review of the date and time stamp included in the EXIF data.  Id. at ¶¶9, 11. According to Williams, the images of the Defendant "show him to be wearing on his left hand a gold wedding ring with a line of five diamonds, or stones that appear to be diamonds, and on his left wrist a men's watch, with a black band and a silver face." Id. at ¶11.

Other images depicted digital anal penetration of pre-pubescent children, in which the wedding ring and the watch, as described, could be seen, id., and others showed the Defendant "engaged in sexually explicit conduct with children," some of which is described in Williams' Affidavit.  Id. at ¶¶11, 13. According to Williams, the images and videos show the Defendant engaged in sexual misconduct with three (3) different pre-pubescent girls, one of whom was identified by a St. Cloud police investigator as the four-year-old girl who accused the Defendant of sexual misconduct in October of 2006.  Id. at ¶12.

Based upon those facts, Williams attested to his belief that the Defendant engaged in sexually explicit conduct with minors, in order to produce child pornography, while using materials that had been transported in interstate commerce.

Id. at ¶14.  Williams attests that, upon his review of the relevant records, the Defendant was listed as the property owner of the St. Cloud Home, had registered two (2) vehicles to that address, and used that address on his driver's license.  Id. at ¶15. Accordingly, in his Affidavit, Williams expressed his belief that the Defendant continued to reside at the St. Cloud Home, and that he remained married to his wife. Id. at ¶16.  Williams further attests that, based upon his experience, individuals are unlikely to discard jewelry, including wedding rings and watches.  Id.

As to the third Search Warrant, which was issued on June 18, 2008, see, Exhibit 3, a search was authorized at St. Cloud Home, for items showing residency or occupancy; computer systems, including laptop computers, scanners, printers, modems, and other peripheral devices; data contained on hard drivers and removable media storage devices, including deleted files, email files, and Internet history data, tending to show the possession and distribution of child pornography; magnetic media, optical media, and compact discs, which would relate to the potential storage of child pornography; papers and effects tending to show the possession or distribution of child pornography, including address books, travel receipts, caller ID logs, diaries, notes, and journals; programs and manuals for computer operating systems and applications; notes and other documents that would reveal passwords,

websites, access codes, and victims' names; ISP bills; digital camera equipment, videotapes, and other items used for the possession or distribution of child pornography; photographs, images, and video footage depicting child pornography; child erotica devices; lubricants; a men's gold wedding ring with five stones; a light colored safe; a tan colored cloth or towel, a pink colored blanket, a plaid colored shower curtain, a multi-colored quilt or bedspread, a child's purple and white sock, and a multi-colored blue and white rug, all as depicted in images previously found on the Defendant's computer; documents relating to day care; a sample of cream-colored berber carpet; blue pillows from the couch; multi-colored brown, tan, and red throw pillows; a red and blue booster chair; and photographs of the Defendant, which would depict his physical characteristics and jewelry. <u>Id.</u>, Application at 1-1.

The fourth Search Warrant was issued by the Stearns County District Court, on June 18, 2008, see, <u>Exhibit 4</u>, and authorized a search of the Sartell Apartment, for items showing residency or occupancy; a black Dell computer system, including scanners, printers, modems, and other peripheral devices; data contained on hard drivers and removable media storage devices, including deleted files, email files, and Internet history data, tending to show the possession and distribution of child pornography; magnetic media, optical media, and compact discs, which would relate

to the potential storage of child pornography; papers and effects tending to show the possession or distribution of child pornography, including address books, travel receipts, caller ID logs, diaries, notes, and journals; programs and manuals for computer operating systems and applications; notes and other documents that would reveal passwords, websites, access codes, and victims' names; ISP bills; digital camera equipment, videotapes, and other items used for the possession or distribution of child pornography; photographs, images, and video footage depicting child pornography; child erotica devices; lubricants; a men's gold wedding ring with five clear colored [sic] stones; and photographs of the Defendant, which would depict his physical characteristics and jewelry.  Id., Application at 1-1, 1-2.

In turn, the fifth Search Warrant was issued by the Stearns County District Court, on June 18, 2008, see, Exhibit 5, and authorized a search of the Defendant's black Apple iPhone, which had been recovered from the Defendant's person during his arrest.  Id., Application at 1-1.  The iPhone had been secured at the St. Cloud Police Department, pending a forensic analysis of the iPhone's data, in order to uncover the assigned telephone number, any stored telephone numbers, and any incoming or outgoing calls, text messages, photographs, or videos.  Id., Application at 1-1.

In support of the third, fourth, and fifth Search Warrants, Jolene Thelen ("Thelen"), who is a police officer with the St. Cloud Police Department, submitted an Application and Affidavit which set forth the reasons that caused her to believe that evidence of criminal activity would be found in the Defendant's St. Cloud Home. See, Exhibit 3, Application at 1-3.[4] Thelen averred that, in October of 2006, Michael Lewandowski ("Lewandowski"), who is an investigator with the St. Cloud Police Department, investigated a sexual assault complaint against the Defendant, which involved two (2) six-year-old female victims, M.E.D. and K.J.K., who attended daycare at the St. Cloud Home. Id. Lewandowski interviewed M.E.D. in connection with that investigation but, due to insufficient evidence, no charges were filed. Id. However, Lewandowski later reviewed the photographs, which were uncovered by the first Search Warrant, pursuant to Dewees's forensic examination, and identified M.E.D. as one of the children depicted in those sexually explicit photographs. Id.

Thelen averred that she also reviewed the photographs, which were uncovered by the first Search Warrant, following Dewees's completion of his forensic

---

[4]The Affidavits, which Thelen submitted in support of the third, fourth, and fifth Search Warrants, are identical, except for a single, additional paragraph which is found in the application for the fifth Search Warrant. Except where otherwise noted, we cite only to the third Search Warrant.

examination, in June of 2008. Id. Thelen attested that, in those images, she "observed prepubescent girls in various sex acts laying on a pink blanket, a blue and pink multi colored quilt, and a tan towel," and she further observed "several items including the berber carpet, a multi colored shower curtain, a rug, pillows, a piano, and home decor," all of which would identify the location at which the photographs were taken. Id. Thelen attested that she observed several of those items at the St. Cloud Home, during the execution of the second Search Warrant, as well as a laptop computer, men's clothing, several men's watches, and mail addressed to the Defendant. Id., Application at 1-4. Thelen attested that, during the execution of the second Search Warrant, her fellow officers observed, in the bedroom of the St. Cloud Home, documents relating to the daycare business of the Defendant's wife, as well as a light-colored safe, which was searched during the execution of the first Search Warrant, and which was found to contain electronic media. Id.

Thelen averred that, at the time of the Search Warrant Application, the Defendant had advised Dawn Shattuck ("Shattuck"), who is an investigator with the St. Cloud Police Department, that he was then living with his parents at the Sartell Apartment. Id. That information had been confirmed by the Defendant's mother, who lived in the Sartell Apartment, and who advised that the Defendant had moved in with

his parents in March of 2007.  Id.  The Defendant's mother also advised that the Defendant made regular use of her black Dell computer, in the Sartell Apartment.  Id.

Thelen averred that she had spoken with the Defendant's spouse, who advised that the Defendant retained his keys to the St. Cloud Home, and continued to use the laptop computer at her residence, given that they shared custody of their children.  Id. The Defendant's spouse also advised that, in February of 2007, just two (2) days after the execution of the first Search Warrant, the Defendant had admitted to taking a photograph of one (1) of the children at her daycare, while he was changing the child's diaper.  Id., Application at 1-5.  The Defendant also admitted that he had taken the photograph after removing the child's diaper.  Id.

In addition to the information above, and in support of the fifth Search Warrant, which authorized a search of the contents of the Defendant's iPhone, Thelen attested that the Defendant had been arrested, and law enforcement had recovered a black Apple iPhone on his person.  See, Exhibit 5, Application at 1-3.  Thelen attested that the iPhone was secured in her desk at the police department, pending the issuance of a Search Warrant for forensic analysis of the data on the iPhone.  Id.

Lastly, Thelen averred that, based upon her training and experience in law enforcement, she was aware that child pornographers "commonly maintain a collection of child pornographic images in the privacy and security of their homes or some other secure location," including "discs, hard drives, media storage devices, compact disc and thumb drives[.]"   Exhibit 3, Application at 1-5.  Thelen further attested that child pornographers "rarely dispose of the collections."  Id.  Accordingly, Thelen attested to her belief, that a search of the St. Cloud Home, the Sartell Apartment, and the Defendant's iPhone, could reveal evidence of the Defendant's criminal conduct.  Id.

As noted, the Defendant has asked us to review the Search Warrants upon their "four corners," in order to determine whether they were supported by probable cause, or contained any other constitutional defects.   We turn first to consider the Defendant's Motion to Dismiss the Indictment.

### III.  Discussion

A.      The Defendant's Motion to Dismiss the Indictment.

The Defendant first argues that the Indictment should be dismissed as unconstitutional, based upon his contention that Congress holds no authority to regulate the conduct in question.  More specifically, the Defendant argues that, here,

the application of Title 18 U.S.C. §2251(a) is an attempt to regulate sexual activity, rather than economic activity, since the Defendant is not alleged to have distributed any pornographic images in interstate commerce.  See, Defendant's Memorandum in Support, Docket No. 25, at 5; Defendant's Reply Memorandum, Docket no. 29, at 1.

The Indictment alleges that the Defendant produced child pornography images "using materials that have been mailed, shipped, or transported in interstate or foreign commerce" -- i.e., his Minolta Dimage X camera.  Id. at 1; see, Indictment, supra.  The Defendant contends that the Government alleges only that he "created the images in question as part of the same course and conduct of engaging in criminal sexual acts," and not that "he produced, distributed or consumed a commodity."  Defendant's Reply Memorandum, supra at 3.  Accordingly, he asks that the Indictment be dismissed, based upon the asserted limits of Congress' power under the Commerce Clause.

In the watershed decision of United States v. Lopez, 514 U.S. 549 (1995), the Supreme Court held that Congress had exceeded its power, under the Commerce Clause, when it enacted the Gun Free School Zones Act of 1990.[5]  The Court

---

[5]The Act made it a Federal offense "'for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone.'"  See, United States v. Lopez, 514 U.S. 549, 550 (1995), quoting Title 18 U.S.C. §922(g)(1)(a)(1988 ed. Supp. V).

identified three categories of activities which are within Congress' power to regulate, including "the use of the channels of interstate commerce;" "the instrumentalities of interstate commerce, or the persons or things in interstate commerce;" as well as those activities which have a "substantial relation to interstate commerce," which required a separate finding that the activity that Congress sought to regulate had a "substantial effect" on interstate commerce.  Id. at 558-59.  "Whether an activity is one that substantially affects interstate commerce is determined by focusing on four factors in particular:  (1) whether the regulated activity is economic in nature; (2) whether the statute contains an express jurisdictional element which limits its application to activities with 'an explicit connection with or effect on interstate commerce;' (3) whether there are congressional findings about the regulated activity's effects on interstate commerce; and (4) whether the connection between the activity and a substantial effect on interstate commerce is attenuated."  United States v. Mugan ("Mugan II"), 441 F.3d 622, 627-28 (8th Cir. 2006), cert. denied, --- U.S. ---, 127 S.Ct. 191 (2006), quoting United States v. Morrison, 529 U.S. 598, 610-13 (2000).  In Lopez, the Court determined that the Gun Free School Zones Act "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected

in any way to interstate commerce."  Id. at 551; see also, United States v. Morrison, supra, and Jones v. United States, 529 U.S. 848 (2000).

Here, the Defendant concedes, as he must, that our Court of Appeals has explicitly held that the production of child pornography, using materials that have traveled in interstate commerce, has a substantial effect on interstate commerce, and therefore, supports Federal jurisdiction under the Commerce Clause.  See, United States v. Betcher, 534 F.3d 820, 824 (8th Cir. 2008)(rejecting the defendant's argument that "the mere transportation across state or international lines of cameras used in the manufacture of child pornography does not constitute an impact upon interstate commerce sufficient to form a jurisdictional basis upon which Congress could validly prohibit the charged conduct under its Commerce Clause powers," and observing that "[m]ore than one panel of this Court has already rejected this precise constitutional attack"), citing United States v. Mugan ("Mugan I"), 394 F.3d 1016, 1020-24 (8th Cir. 2005), vacated on other grounds, 546 U.S. 1013 (2005), United States v. Hampton, 260 F.3d 832, 834-35 (8th Cir. 2001), cert. denied, 535 U.S. 1058 (2002), United States v. Hoggard, 254 F.3d 744, 746 (8th Cir. 2001), United States v. Bausch, 140 F.3d 739, 740-41 (8th Cir. 1998), cert. denied, 525 U.S. 1072 (1999), and United States

v. Koenen, 230 Fed.Appx. 631 (8th Cir. 2007), cert. denied, --- U.S. ----, 128 S.Ct. 947 (2008).

Instead, the Defendant argues that we must determine, under the particular facts of this case, whether the "regulated activity" is economic in nature -- i.e., whether the allegations against him involve "the production, distribution, and consumption of commodities."  See, Defendant's Memorandum in Support, supra at 3-4, quoting Gonzalez v. Raich, 545 U.S. 1, 25 (2005), quoting, in turn, Webster's Third New International Dictionary, at 720 (1966).  As noted, the Defendant argues that, here, the images in question were not commodities, because he allegedly "created the images * * * as part of the same course and conduct of engaging in criminal sexual acts."  Id. at 3.  Accordingly, the Defendant maintains that "[t]he creation of each image was a sexual act; none were intended to be distributed as pornography, nor were they, in fact, distributed."  Defendant's Reply Memorandum, supra at 5.  We reject such a distinction as artificial, and wholly unsupported by the Supreme Court's analysis in Raich.

In Raich, the Court considered a constitutional challenge to the Controlled Substances Act ("CSA"), Title 21 U.S.C. §801 et seq., and its prohibition on the intrastate possession and manufacture of marijuana for medical use.  Id. at 7.  The

- 24 -

Court first underscored that its prior case law had "firmly establishe[d] Congress'

power to regular **purely local** activities that are part of an economic 'class of

activities' that have a substantial effect on interstate commerce." Id. at 17 [emphasis

added], citing Perez v. United States, 402 U.S. 146, 151 (1971) and Wickard v.

Filburn, 317 U.S. 111, 128-129 (1942).  Moreover, the Court explicitly noted that its

decision in Wickard, which concerned the intrastate production of wheat for personal

consumption, had "establishe[d] that Congress can regulate purely intrastate activity

that is not itself 'commercial,' in that it is not produced for sale, if it concludes that

failure to regulate that class of activity would undercut the regulation of the interstate

market in that commodity." Id. at 18, citing Wickard v. Filburn, supra at 127-128.

The Court continued to compare the wheat that was at issue in Wickard, with

the marijuana at issue in Raich, as follows:

> The similarities between this case and Wickard are striking.
> **Like the farmer in Wickard, respondents are**
> **cultivating, for home consumption, a fungible**
> **commodity for which there is an established, albeit**
> **illegal, interstate market.** Just as the Agricultural
> Adjustment Act was designed "to control the volume [of
> wheat] moving in interstate and foreign commerce in order
> to avoid surpluses * * * " and consequently control the
> market price, id., at 115, 63 S.Ct. 82, a primary purpose of
> the CSA is to control the supply and demand of controlled
> substances in both lawful and unlawful drug markets. * * *

- 25 -

> In Wickard, we had no difficulty concluding that Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions.  Here too, Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would similarly affect price and market conditions.
>
> More concretely, one concern prompting inclusion of wheat grown for home consumption in the 1938 Act was that rising market prices could draw such wheat into the interstate market, resulting in lower market prices. Wickard, 317 U.S., at 128, 63 S.Ct. 82.  The parallel concern making it appropriate to include marijuana grown for home consumption in the CSA is the likelihood that the high demand in the interstate market will draw such marijuana into that market.  While the diversion of homegrown wheat tended to frustrate the federal interest in stabilizing prices by regulating the volume of commercial transactions in the interstate market, the diversion of homegrown marijuana tends to frustrate the federal interest in eliminating commercial transactions in the interstate market in their entirety.  **In both cases, the regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity.**

Id. at 18-19 [emphasis added and footnotes omitted].

We find the Court's analysis to be equally applicable here, with respect to the

intrastate production of child pornography, and we reject the Defendant's argument

that child pornography is not a "commodity" within the reach of the Commerce Clause.

First, we note that our Court of Appeals has upheld the constitutionality of Title 18 U.S.C. §2251 in three (3) decisions, since the Supreme Court issued its decision in <u>Raich</u>. See, <u>United States v. Betcher</u>, supra at 824; <u>United States v. Koenen</u>, supra; <u>Mugan II</u>, supra at 629-30; see also, <u>United States v. Kent</u>, 2008 WL 342886 at *2 (W.D. Mo., February 5, 2008).

Second, our research has disclosed that several Courts have expressly applied the analysis in <u>Raich</u> when concluding that, the same as marijuana, child pornography is a fungible commodity.  In a recent post-<u>Raich</u> case, the Court of Appeals for the Seventh Circuit rejected a similar constitutional challenge to Title 18 U.S.C. §2251(a). See, <u>United States v. Blum</u>, 534 F.3d 608, 611 (7th Cir. 2008)(determining that "the [Child Pornography Prevention Act] is part of a comprehensive regulatory scheme designed to eliminate **the market for child pornography** similar to the regulation of controlled substances by the [Controlled Substances Act]")[emphasis added].  In <u>Blum</u>, the defendant was convicted of manufacturing child pornography, in his home, "for his private viewing and possession." <u>Id.</u> at 609.  The facts in <u>Blum</u> are analogous, given that "[t]he only movement in interstate commerce that [was] alleged [was] that

the min-DV tapes were manufactured outside the state of Wisconsin." Id.

Accordingly, the defendant argued that Congress had exceeded its powers under the

Commerce Clause in enacting Section 2251(a). Id.

The Blum Court rejected that argument, and concluded that the Supreme

Court's decision, in Raich, had only "reaffirm[ed] the soundness" of its earlier

decisions that had upheld Congress's power to "properly criminalize even intrastate

possession of child pornography as necessary to close a loophole that was

undermining its ability to regulate interstate child pornography." Id. at 610, citing

United States v. Angle, 234 F.3d 326 (7th Cir. 2000).  In addition, the Blum Court

found that, when comparing the intrastate production of marijuana with the intrastate

production of child pornography, "[p]arallel concerns are present in the regulation of

the interstate child pornography market, and accordingly since the Raich decision

many circuits have rejected a similar Commerce Clause challenge to that raised by

Blum." Id. at 611, citing, in part, United States v. Forrest, 429 F.3d 73, 78 (4th Cir.

2005)(applying Raich to a child pornography prosecution, and concluding that,

although "the regulated commodities differ," "that distinction is immaterial," because

"[i]n both statutes Congress 'directly' regulated economic activity in a 'fungible

commodity,'" whether marijuana or child pornography); United States v. Chambers,

441 F.3d 438, 455 (6th Cir. 2006)(concluding that, like the Controlled Substance Act at issue in <u>Raich</u>, the Federal child pornography statutes constitute "comprehensive legislation to regulate the interstate market in a fungible commodity"); <u>United States v. Grimmett</u>, 439 F.3d 1263, 1273 (10th Cir. 2006)("Child pornography is equally fungible and there is no question an established market exists for its sale and exchange."), quoting <u>United States v. Jeronimo-Bautista</u>, 425 F.3d 1266, 1272-73 (10th Cir. 2005); <u>United States v. Maxwell</u>, 446 F.3d 1210, 1216 (11th Cir. 2006) ("[M]uch of the Court's analysis [in <u>Raich</u>] could serve as an opinion in this case by simply replacing marijuana and the CSA with child pornography and the [Child Pornography Prevention Act]."); <u>United States v. Sullivan</u>, 451 F.3d 884, 891 (D.C. Cir. 2006)("Like the illicit drug networks motivating passage of the CSA, the trade in child pornography is quintessentially economic," and "[l]ike marijuana, child pornography is a fungible commodity for which there is an established, albeit illegal, interstate market.")[internal quotation omitted].

We agree with the conclusions of the referenced Courts, that <u>Raich</u> only reinforced the previous rulings in this Circuit, with respect to the constitutionality of Section 2251(a), and we further agree that the regulation of child pornography "is squarely within Congress' commerce power because production of the commodity

meant for home consumption, be it wheat or marijuana," -- or child pornography -- "has a substantial effect on supply and demand in the national market for that commodity." Gonzales v. Raich, supra at 19.

The Defendant argues that he is alleged to have "sexually abused minors," and he attempts to distinguish Raich by asserting that "[s]exual acts are not an [sic] economic goods, and they are not commodities." Defendant's Reply Memorandum, supra at 3. However, the Defendant is not simply alleged to have engaged in criminal sexual conduct -- he is charged with the production of child pornography, and we find no basis for his argument that child pornography is not a "fungible commodity for which there is an established, albeit illegal, interstate market." United States v. Sullivan, supra at 891, quoting Gonzales v. Raich, supra at 18. This is true, notwithstanding the Defendant's assertion that there is no allegation, here, that the images in question were distributed in interstate commerce. See, United States v. Fadl, 498 F.3d 862, 865-66 (8th Cir. 2007); United States v. Bausch, supra at 740-41 (rejecting the defendant's argument that "Congress lacks power to regulate the possession of sexually explicit photographs of minors when the photographs have not traveled in interstate commerce and are not intended to be placed in commerce").

Moreover, in concluding that child pornography has a substantial effect on interstate commerce, the past decisions of our Court of Appeals have necessarily concluded, as a part of their analysis, that "the regulated activity is economic in nature." Mugan II, supra at 627-28, quoting United States v. Morrison, supra at 610-13; see, United States v. Betcher, supra at 824; United States v. Hampton, supra at 834-35; United States v. Hoggard, supra at 746; United States v. Koenen, supra.  In fact, the Defendant's precise argument -- that the production of intrastate child pornography is somehow "non-economic" -- has been implicitly, if not explicitly, rejected by our Court of Appeals.  See, Mugan II, supra at 629-30 (rejecting the defendant's argument that "the intrastate production and possession of child pornography without a proven intent to distribute it beyond the state is noneconomic conduct outside the reach of the commerce power," and stating that "[t]he extent of the interstate market for child pornography described by Congress and its dependence upon locally produced materials demonstrate that the intrastate production and possession of child pornography is an economic activity connected to interstate commerce.").

In sum, having considered, and rejected, the Defendant's constitutional claim, we recommend the denial of his Motion to Dismiss his Indictment.

B.     The Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

We turn next to consider the Defendant's claim, that all five (5) Search Warrants violated his rights under the Fourth Amendment. The analysis which follows is unaided by any pre- or post-Hearing briefing, or by any specific recitation, during the course of the Hearing on the Motion, as to any purported deficiencies in the Warrants at issue. Of course, our obligation is to independently assess the legitimacy of the Warrants, and to undertake our own independent research, and so, we turn to consider whether the Search Warrants issued without an adequate showing of probable cause, or upon impermissibly stale information.

1.     Standard of Review. In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer, will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband. See, Warden v. Hayden, 387 U.S. 294 (1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996). In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair

probability that contraband, or evidence of a crime, will be found in a particular, designated place.  See, <u>United States v. Gladney</u>, 48 F.3d 309, 313 (8th Cir. 1995); <u>United States v. Tagbering</u>, 985 F.2d 946, 949 (8th Cir. 1993).  For these purposes, probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal rules."  <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983); see also, <u>Ornelas v. United States</u>, 517 U.S. 690, 695 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'"  <u>United States v. Ryan</u>, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting <u>United States v. Goodman</u>, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999).  In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis.  See, <u>United States v. Anderson</u>, 933 F.2d 612, 614 (8th Cir. 1991); <u>Technical Ordnance, Inc. v. United States</u>, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002).  Moreover, the reviewing Court must not engage in a <u>de novo</u> review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant.  See, <u>United States v. Maxim</u>, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); <u>United States v. Curry</u>,

911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991).  This mandated

deference to the determination of the issuing Judicial Officer is consistent with the

Fourth Amendment's sound preference for searches that are conducted pursuant to

Warrants.  See, <u>Illinois v. Gates</u>, supra at 236.

        2.     <u>The Federal Search Warrants</u>.  As noted, the first Search Warrant

was issued on February 23, 2007, based upon Williams' averments concerning the

Defendant's attempt to download child pornography in October of 2006.  During the

execution of the first Search Warrant, law enforcement discovered hundreds of

sexually explicit photographs, on the Defendant's computer, which were taken with

a Minolta Dimage X digital camera -- the same model of camera which was seized

from the Defendant's St. Cloud Home.  Some of those photographs depicted the

Defendant wearing a gold wedding ring with five (5) diamonds, and a black-banded

watch with a silver face.  Other images depicted sexually explicit images of children,

or the digital penetration of prepubescent children, by a person wearing a wedding

ring and watch, which appeared to be identical to those worn by the Defendant.  In

additional, a digital movie was recovered, which depicted an adult male, who

appeared to be the Defendant, performing a sex act on a prepubescent girl.[6]  Based

upon his review of those images, Williams applied for the second Search Warrant, in

order to seizure of the Defendant's wedding ring and watch, and that Warrant issued

on June 17, 2008.[7]

   We first consider whether the information, which was contained in the

Affidavits of Williams, was impermissibly stale at the time that the Search Warrants

issued.  It is axiomatic that, at the time a Search Warrant is issued, there must be

---

[6]The Defendant has not asserted that the Affidavits, which were proffered in
support of the second, third, fourth, and fifth Search Warrants, failed to sufficiently
describe the pornographic images which were found during the execution of the first
Search Warrant.  Nor do we find any basis for such an argument on this Record, given
the explicit descriptions which are contained in the Affidavits of both Williams, and
Thelen.   See, United States v. Chrobak, 289 F.3d 1043, 1045 (8th Cir. 2002)
(reiterating that, in order to make an "independent judicial determination," that the
images identified in a Supporting Affidavit are, in fact, child pornography, "the judge
must either view the images or rely on a detailed factual description of them"), citing
New York v. P.J. Video, Inc., 475 U.S. 868, 873-74 (1986).

[7]Although we recognize that some of the statements, which were included in
Williams's Affidavit, were based upon the observations of other law enforcement
personnel, "probable cause may be based on the collective knowledge of all law
enforcement officers involved in an investigation and need not be based solely upon
the information within the knowledge of the officer on the scene if there is some
degree of communication." United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003),
quoting United States v. Horne, 4 F.3d 579, 585 (8th Cir. 1993); see also, Doran v.
Eckold, 409 F.3d 958, 965 (8th Cir. 2005), citing United States v. Hensley, 469 U.S.
221, 232 (1985).

probable cause to support its issuance.  See, <u>United States v. Ozar</u>, 50 F.3d 1440, 1446 (8th Cir. 1995), cert. denied, 516 U.S. 871 (1995).  Therefore, a lapse of time, between the observations of a witness and the issuance of a Search Warrant, like a delay in executing a Search Warrant, "may make probable cause fatally stale."  <u>United States v. Maxim</u>, supra at 397 [quotations omitted].

"There is no bright-line test for determining when information is stale," and the passage of time, alone, is "not always the controlling factor," as other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry.  <u>Id.</u>, quoting <u>United States v. Koelling</u>, 992 F.2d 817, 822 (8th Cir. 1993); <u>United States v. Rugh</u>, 968 F.2d 750, 754 (8th Cir. 1992); see also, <u>United States v. Chrobak</u>, 289 F.3d 1043, 1046 (8th Cir. 2002); <u>United States v. LaMorie</u>, 100 F.3d 547, 554 (8th Cir. 1996).  As but one example, when the Affidavit alleges an "ongoing continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause."  <u>United States v. Rugh</u>, supra at 754.  Therefore, in our analysis, we must not "simply count[] the number of days between the occurrence of the facts supplied and the issuance of the affidavit," but must consider any passage of time "in the context of a specific case and the nature of the crime under investigation."  <u>United</u>

States v. Maxim, supra at 397, quoting United States v. Koelling, supra at 822; compare, United States v. Maxim, supra at 397-98 (upholding Warrant, which was based upon four-month-old information that the defendant possessed firearms, because firearm enthusiasts tend to retain their weapons for long periods of time); United States v. Rugh, supra at 753-54 (finding good-faith reliance on Warrant, which was based upon sixteen-month-old information that the defendant possessed child pornography, because "pedophiles typically retain child pornography for a long time").

We find that the information, which was included in Williams's Affidavits, was not fatally stale. While it is true that the facts, which are recited in Williams's first Affidavit, date back to October of 2006, which was several months prior to the execution of the first Search Warrant, and more than one (1) year prior to the execution of the second Search Warrant, we must consider the "nature of the criminal activity involved and the kind of property subject to the search." See, United States v. Maxim, supra at 397, citing United States v. Rugh, supra at 754. "Where, as here, the supporting affidavit presents a picture of continuing conduct, as opposed to an isolated instance of wrongdoing * * * the passage of time between the last described act and the presentation of the application becomes less significant." United States

v. Gigante, 979 F. Supp. 959, 964 (S.D.N.Y. 1997)(holding that a wiretap application was supported by probable cause, even though most of the information was at least three to five years old)[internal quotations omitted].

Here, Williams's Affidavit in support of the first Search Warrant recounts the Defendant's attempts to download child pornography, as well as the investigation into his alleged sexual misconduct in October of 2006. Williams's Affidavit in support of the second Search Warrant also recounts those allegations, and Williams further attests to the recovery of hundreds of sexually explicit photographs from the St. Cloud Home, in February of 2007. We find that the passage of time, from the beginning of the investigation, until the issuance of the Search Warrants, did not render the information in Williams's Affidavits fatally stale.

In particular, we note that "the lapse of time is least important * * * when the [evidence of criminal activity] is not likely to be destroyed or dissipated." United States v. Horn, 187 F.3d 781, 786 (8th Cir. 1999), citing United States v. Koelling, supra at 822-823. Here, Williams attested that child pornographers often maintain a collection of images, which grows over time, and which is rarely discarded. Based upon those averments, we find that the passage of several months, between the Defendant's attempt to download child pornography, and the execution of the first

Search Warrant, did not render the information contained in the Supporting Affidavit impermissibly stale. The same is true with respect to the passage of time between the first and second Search Warrants.

Based upon the averments of Williams, concerning the tendency of persons who collect child pornography to retain such materials for long periods of time, as well as Williams's averments concerning the quantity of sexually explicit photographs which were seized, and the forensic examination which was required to uncover those images, we conclude that the information in the Affidavits was sufficient to create a "fair probability" that such materials were present in the Defendant's St. Cloud Home, at the time that the Search Warrants were executed. See, United States v. Chrobak, supra at 1046 (testimony that child pornographers generally retain their pornography for extended periods allowed for a probable cause finding to search the defendant's home, when the evidence of its presence at the home was three months old); United States v. Horn, supra at 787(three month old evidence of child pornography was not stale); United States v. Newsom, 402 F.3d 780, 782 (7th Cir. 2005)("Information a year old is not necessarily stale as a matter of law, especially where child pornography is concerned."), citing United States v. Lacy, 119 F.3d 742, 745 (9th Cir. 1997)("[U]pholding search warrant based on information ten months old because 'the

[agent] explained that collectors and distributors of child pornography value their sexually explicit materials highly, "rarely if ever" dispose of such material, and store it "for long periods" in a secure place, typically in their homes.'"); United States v. Hay, 231 F.3d 630, 636 (9th Cir. 2000)(six (6) month time period between the internet transmission of child pornography and application for Search Warrant did not render the transmission evidence insufficient to support a finding of probable cause that evidence of child pornography was still stored on the defendant's computer); United States v. Diaz, 303 F. Supp.2d 84, 90 (D. Conn. 2004)(sixteen (16) month delay did not render the evidence of child pornography possession stale); see also, United States v. Wagers, 339 F. Supp.2d 994, 941 (E. D. Ky. 2004)("In child pornography cases, courts have repeatedly recognized that collectors of child pornography tend to retain their materials, and this Court agrees * * *."); United States v. Winningham, 953 F. Supp. 1068, 1078-80 (D. Minn. 1996).

Here, after considering the totality of the circumstances, and after applying a practical, common sense reading to Williams's Affidavits, we find that the Magistrate Judges, who issued the Warrants in question, were provided with substantially more than a reasonable likelihood to believe that a search of the Defendant's St. Cloud Home would reveal evidence relating to illegal child pornography, and that a search

of the St. Cloud Home, and the Defendant's person, would result in the recovery of the Defendant's wedding ring and watch.   Compare United States v. McCoy, 483 F.3d 862, 863-64 (8th Cir. 2007)("Taken together, we conclude that these facts -- alleged sexual abuse of a toddler, possession of pornography likely involving minors, and pornography admittedly on McCoy's computer -- establish probable cause to search the computer for pornography involving children.").

We find nothing to dispute the conclusion, that law enforcement had established a nexus between the Defendant and the St. Cloud Home, given that motor vehicle records, police records, property tax records, and driver's license records, had listed that residence as his home address.  We further find nothing, in this Record, to dispute the conclusion that law enforcement had established a nexus between the Defendant, and the computer which was used to download child pornography, based upon the information provided by his Internet Service Provider, and between the Defendant and his jewelry, based upon the images which showed the Defendant wearing his wedding ring and watch, and the likelihood that the Defendant would retain those items of jewelry.

Accordingly, we conclude that the Federal Search Warrants were issued upon a proper showing of probable cause, and we recommend that the Defendant's Motion to Suppress be denied, insofar as it relates to those Search Warrants.

3.    The State Search Warrants.   Next, we turn to consider the State Search Warrants.   As noted, Thelen applied for the third, fourth, and fifth Search Warrants, in June of 2008, in order to search the St. Cloud Home, the Sartell Apartment, and the Defendant's iPhone, largely for images of child pornography and related evidence.   In support of her applications, Thelen recounted the history of the investigation, dating back to October of 2006, and including the recovery of hundreds of sexually explicit photographs, from the St. Cloud Home, in February of 2007.

Thelen further attested that, on the date of her applications, she and other St. Cloud police officers had assisted in the execution of the second Search Warrant at the St. Cloud Home, for the seizure of the Defendant's wedding ring and watch.   During the execution of that Warrant, Thelen observed several items in the St. Cloud Home, including particularly-described blankets, curtains, pillows, and bedspreads, which appeared identical to items which she had observed in the sexually explicit photographs, that had been seized from the St. Cloud Home in February of 2007. During the execution of the second Search Warrant, Thelen also observed a laptop

computer, and mail addressed to the Defendant, while another officer observed a light-colored safe, which had contained electronic media when searched in February of 2007.

Thelen averred that the Defendant was living with his parents, at the Sartell Apartment, and that his mother had confirmed his use of her black Dell computer. Thelen further averred that the Defendant's wife had confirmed that the Defendant continued to have access to the St. Cloud Home, that he made use of her laptop computer there, and that he had admitted to taking a photograph of a young girl, who had attended daycare in the St. Cloud Home, after removing her diaper. In addition to the computers, Thelen averred that the iPhone had been recovered from the Defendant's person, during a search incident to his arrest. Lastly, Thelen attested that child pornographers often maintain a collection of child pornography images in secure locations, such as their homes, and that such collections are rarely discarded.

Based upon our previously detailed analysis, which related to the Federal Search Warrants, we find that the information, which is contained in Thelen's Affidavits, was not impermissibly stale. Moreover, the older information was freshened by Thelen's observations at the St. Cloud Home, concerning the presence of items that she recognized as being depicted in the sexually explicit photographs, as

well as the information she received from the Defendant's mother and spouse, concerning his ongoing computer use.  See, <u>United States v. Ozar</u>, supra at 1446 ("'[W]here recent information corroborates otherwise stale information, probable cause may be found.'"), quoting <u>United States v. Macklin</u>, 902 F.2d 1320, 1326 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991); see also, <u>United States v. Morrow</u>, 2004 WL 385278 at *1 (8th Cir., March 2, 2004)("The seven-day delay did not render stale the information on which the Warrant was based."), citing <u>United States v. Gibson</u>, 123 F.3d 1121, 1124-25 (8th Cir. 1997)(four-day delay did not render the Warrant stale where drug activity was ongoing).

As with the Federal Search Warrants, after considering the totality of the circumstances, and after applying a practical, common sense reading to Thelen's Affidavits, we find that the Judicial Officers, who issued the Warrants in question, were provided with substantially more than a reasonable likelihood to believe that a search of the Defendant's St. Cloud Home, Sartell Apartment, and iPhone, would reveal evidence relating to illegal child pornography.  We find nothing to dispute the conclusion, that law enforcement had established a nexus, between the Defendant and the St. Cloud Home, given the information that Thelen had received from the Defendant's wife, concerning his continued access to that residence, and her laptop

computer. Law enforcement had also established a nexus between the Defendant, and the Sartell Apartment, given the information that Thelen had received from the Defendant's mother, concerning his residency and use of her computer at that location. Lastly, law enforcement had established a nexus between the Defendant and the iPhone which was seized from his person, during the course of his arrest.

Accordingly, we conclude that the State Search Warrants were issued upon a proper showing of probable cause, and we recommend that the Defendant's Motion to Suppress Evidence Derived from Searches and Seizures be denied, in all respects.[8]

---

[8]Even if the information in any of the Search Warrants were insufficient to establish probable cause, we would be compelled, by the law of this Circuit, to find that the officers' reliance upon the Search Warrant was reasonable, because the Warrants "w[ere] not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999), citing United States v. Leon, 468 U.S. 897, 922-23 (1984). Here, "[n]o evidence suggests that the issuing judge 'wholly abandoned his judicial role,' especially in light of the previously stated reasons supporting our probable cause determination." United States v. Terry, 305 F.3d 818, 823 (8th Cir. 2002)(finding Leon good faith exception applicable to a Search Warrant issued to seize alleged child pornography), citing United States v. Leon, supra at 923. Accordingly, even if probable cause were lacking, we would still recommend that the Defendant's Motion to Suppress be denied.

C.    The Defendant's Motion to Suppress Statements, Admissions, and Answers.

As to the Defendant's Motion to Suppress Statements, Admissions, and Answers, at the Hearing, the Government represented that it does not intend to use any of the Defendant's statements during its case-in-chief.  Therefore, we recommend that the Defendant's Motion to Suppress Statements, Admissions, and Answers, be denied as moot.

NOW, THEREFORE, It  is --

RECOMMENDED:

1.    That the Defendant's Motion to Suppress Statements, Admissions and Answers [Docket No. 16] be denied, as moot.

2.    That the Defendant's Motion to Suppress Evidence Derived from Searches and Seizures [Docket No. 17] be denied.

3.    That the Defendant's Motion to Dismiss Indictment [Docket No. 24] be denied.

Dated: September 4, 2008                    s/Raymond L. Erickson
                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than September 19, 2008**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than September 19, 2008**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.